UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| CAROLYN R. DOUGLAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  1:08CV63 TIA |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §405(g) for judicial review of the denial of

Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act.  The

parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

On December 28, 2004, Plaintiff filed an application for Disability Insurance Benefits ("DIB")

alleging disability beginning December 22, 2003 due to sleep disorder, high blood pressure, and

seizures.  (Tr. 70, 84-86)  The application was denied, and Plaintiff requested a hearing by an

Administrative Law Judge (ALJ).  (Tr. 29, 69-74)  On April 28, 2006, Plaintiff testified at a hearing

before an ALJ.  (Tr. 299-349)  Plaintiff appeared and testified at a supplemental hearing before the ALJ

on February 9, 2007.  (Tr. 350-406) In a decision dated May 19, 2007, the ALJ determined that Plaintiff

was not under a disability at any time through the date of decision.  (Tr. 11-28)  Thereafter, the Appeals

Council denied Plaintiff=s request for review on February 28, 2008.  (Tr. 3-5)  Thus, the decision of the

ALJ stands as the final decision of the Commissioner.

## II.  Evidence Before the ALJ

At the first hearing before the ALJ on April 28, 2006, Plaintiff appeared with counsel. Vocational Expert ("VE") Jeffrey Magrowski also testified, as well as Plaintiff's friend, Raymond Reimer.  Upon questioning by her attorney, Plaintiff stated that her past work experience included running a robot and C&C machine in a tool and dye company.  At that time, Plaintiff lived alone and maintained her 5 acres by herself.  (Tr. 299-305)

Plaintiff's claims of disability stemmed primarily from seizures.  Plaintiff learned of her seizures after her second car accident.  However, she did not remember anything that happened during the seizures.  She testified that she experienced large and small seizures.  During a large seizure, Plaintiff lost consciousness for about 30 minutes.  She stated that she had experienced five or six such seizures since 2003.  After Plaintiff regained consciousness, she was tired and disoriented, and she had a headache and sore mouth where she bit her gum.  The after-effects lasted the rest of the day, with the headaches sometimes lasting a day or two.  Plaintiff's smaller seizures happened at night when she was sleeping.  Plaintiff stated that she would "mess" herself in the bed.  In addition, she would bite her tongue, cheek, or jaw.  These smaller seizures occurred three or four times per month.  Plaintiff was unaware that a seizure was coming on, but she testified that she took medications to control the seizures.  (Tr. 305-311)

Plaintiff also testified to having problems with concentration and memory.  For instance, she forgot her house-mate's hat three times when getting ready for the hearing.  Plaintiff stated that she had moved in with Raymond Rhymer and had lived with him for a couple of years.  Mr. Rhymer helped her remember things such as attending appointments and taking medications.  Plaintiff further testified that she had difficulty following conversations.  She stated that she would just black out and

was unable to grasp what people were saying. In addition, she could not watch a TV show from start to finish. During a normal day, Plaintiff watched the news, tried to read, and took care of her 3 dogs and 2 cats. She also performed some light cleaning. She did not cook because she forgot that the stove was on. Mr. Rhymer did the shopping. Although she had a driver's license, Plaintiff did not drive for fear of having a seizure while driving. (Tr. 311-14)

Plaintiff also testified regarding problems sleeping. She stated that she did not sleep through the night and that she only slept about 3 hours. Although Plaintiff denied receiving psychiatric treatment, she testified to seeing a counselor for depression and taking prescription medication. Plaintiff stated that she had experienced suicidal thoughts. She was proud of what she used to be able to accomplish and was upset that she could not longer do those things. Plaintiff stated that her sleep deprivation and stress caused her seizures. Plaintiff planned to schedule an appointment once she could afford insurance to test the source of her seizures. (Tr. 314-16)

The ALJ also questioned Plaintiff during the hearing. She stated that her last daytime seizure was in February, 2006, when she blacked out while cleaning a hurricane lamp. She woke up with blood on her face from the glass. After her seizures, Plaintiff would go to the hospital or see a doctor to check her anti-convulsive medication levels. Plaintiff also testified that, since February, she experienced three night-time seizures per month. Although her doctor recommended that Plaintiff increase her medication dosage, she stated that she had not yet done so, as she just recently started receiving Medicaid. However, Plaintiff testified that the medication never controlled and prevented the seizures. (Tr. 316-19)

Plaintiff also testified to having daily episodes during which time she would just "blank out." Her doctor notified her that these spells were petite mild seizures. The medication did not eliminate

these spells either.  Further, Plaintiff attributed her memory problems to her seizure disorder.  With regard to her depression, Plaintiff stated that her depression worsened after the seizures.  In addition, she believed that her memory problems were also attributable to the anti-depressant medication.  She stated that she was no longer independent or self-sufficient, and she was unable to live alone.  Plaintiff did not belong to any social groups.  Her friend did most of the grocery shopping while she stayed home.  Plaintiff visited her daughter and grandson for one week every 3 or 4 months.  She would not stay alone with her grandson for fear of harming him.  (Tr. 320-23)

Plaintiff also testified regarding side effects from her medications.  She reported weight gain, vomiting, and nausea.  Plaintiff's doctor, Dr. David Lee, specialized in seizure disorders.  She had been his patient since April 2005, and she saw him once every two months or after she had a seizure.  Now that Plaintiff was on Medicaid, she was able to increase her anti-convulsion medication to 5 pills per day, as prescribed by Dr. Lee.  Plaintiff stated that Dr. Lee placed restrictions on driving and performing her past relevant work due to the dangerous machinery.  Plaintiff was afraid to get a job due to her seizures.  However, she had transportation available.  (Tr. 323-28)

Plaintiff further stated that she only slept about 3 hours per night.  Prior to the seizures, Plaintiff slept 8 to 9 hours at night.  She woke up at 6:00 a.m. every morning and felt draggy and sleepy throughout the day.  She usually did not take naps; however, she would sleep for about an hour during the day once a week.  Plaintiff's most strenuous daily activities were feeding the animals and picking up tree limbs, weighing no more than 5 pounds.  Plaintiff planned to plant flowers, but her friend would do the digging where Plaintiff wanted the flowers.  On a daily basis, Plaintiff did not cook, although she could make sandwiches.  She washed dishes and did laundry.  Plaintiff did not iron clothing.  Plaintiff also attended, but did not enjoy, sessions at the mental health community center.

Plaintiff also reported crying spells and irritation. She got along better with her boyfriend once she was diagnosed with epilepsy. Mr. Rhymer also stated that Plaintiff went from tears to anger, and he did not know how to handle her moods. (Tr. 328-33)

Plaintiff also testified that she was not well-balanced and that her equilibrium was off due to her medication. She fell down all the time while walking, and she opined that she was having seizures. Plaintiff stated that she experienced these falling down episodes a couple times per week or more. Mr. Rhymer added that Plaintiff would fall and hurt herself but have no recollection of the event. (Tr. 333-35)

Plaintiff's attorney then questioned Mr. Rhymer. He stated that he had known Plaintiff for 6 years and that they currently lived together. When he first met Plaintiff, she was independent and self-sufficient, and she never whined. Now, he left her notes on the refrigerator and stove to remind her to do things, and he called her several times a day to check on her safety. For example, he returned from work one day, and Plaintiff had left something in the oven too long, causing the house to smell of smoke. In addition, she put things in the dryer that did not belong. Plaintiff did only light chores and fed the pets. In addition, Mr. Rhymer testified that Plaintiff could not remember directions unless he wrote them in detail. She would frequently repeat conversations several times. With regard to stress, Plaintiff went from crying to anger and appeared to have no control of her emotions. Mr. Rhymer stated that Plaintiff only visited with her daughter and grandson. She avoided being around his family and friends. Plaintiff occasionally went with Mr. Rhymer to the grocery store, but he normally did the shopping. Plaintiff did not sleep at night, and he knew when she had a seizure because she would initially be unresponsive to her name. Mr. Rhymer opined that Plaintiff fell more than twice a week as a result of the seizures. (Tr. 336-43)

The ALJ also questioned Mr. Rhymer, who testified that Plaintiff could lose control of her bladder or bowels anywhere from 3 times a week to once every 3 or 4 weeks. He described one major seizure while Plaintiff slept, stating that she defecated in the bed and bit her jaw so hard that blood came out of her mouth. The day after these types of episodes, Plaintiff was more tense and apprehensive. (Tr. 343-45)

The VE, Jeffrey Magrowski, also testified at the hearing. The ALJ posed a hypothetical question, asking the VE whether, assuming the ALJ found Plaintiff's testimony regarding her spells and the frequency as she described, Plaintiff would be able to sustain any work activity. The VE answered that Plaintiff could not maintain a regular work day with those limitations. However, if the VE assumed that Plaintiff had a history of seizures with her only limitation being the inability to work in a hazardous work setting, the inability to climb ladders, ropes or scaffolding, and the inability to drive a car. Given this hypothetical, the VE testified that Plaintiff could work in an office doing data entry. In Missouri, over 10,000 such jobs existed, and over a million existed in the national economy. If the VE assumed that the Plaintiff had at least one major seizure every two months, which could occur at work and require medical attention or absence, Plaintiff would have trouble maintaining a job because an employer would not take that risk. (Tr. 345-46)

Plaintiff testified at a supplemental hearing held on February 9, 2007. Her attorney was present, along with VE Magrowsk and Raymond Rhymer. Dr. James Reid, medical expert, was present via telephone. The ALJ first mentioned that he would leave the record open for 30 days and admitted additional exhibits into evidence.

Plaintiff first testified, stating that she experienced 1 or 2 major seizures a month. She would smell sulfur, black out, bite the inside of her gum or cheek, and urinate on herself. She testified that

her seizures had increased in frequency and that she fell down the stairs during a seizure in December, and she had a seizure in the back seat of Mr. Rhymer's car in January. She tried to go to the hospital but was denied treatment due to lack of insurance. Plaintiff also stated that she had minor seizures where she would stare into space. She believed that these episodes lasted from seconds to minutes, but she had no recollection of them happening. She lost blocks of time and days. Dr. Lee gave her memory tests; however, she had never passed. Plaintiff also testified to having anger problems and sleep problems. If she took two sleeping pills, Plaintiff could sleep for 5 hours. (Tr. 357-61)

Plaintiff took Lamictal, which Dr. Lee prescribed. He gave her free samples, as she had no insurance and could not afford the $566.00 per month for the medication. Dr. Lee also recommended placing Plaintiff in the hospital to see what caused the seizures. However, she could not participate in the study until she could afford it. Plaintiff also took Citalopram for depression. She testified that she had been taking the medication for 2 to 3 months. (Tr. 361-67)

With regard to her August 29, 2006 psychological examination by Dr. Stephen Jordan, Plaintiff stated that nothing affected her ability to properly present herself during the exam and that she tried the best she could. Dr. Jordan had diagnosed major depression, recurrent; post-traumatic stress disorder; and rule out borderline personality disorder. Plaintiff testified that her condition had not changed since then, other than more frequent seizures. In addition, she was less active at home. She mostly fed her dogs and listened to the TV. She could do some chores if her boyfriend left a list. Normally, she played with the dogs, tried to read, and watched TV a little. She also did light dusting and washed laundry. Her boyfriend, Mr. Rhymer, called her frequently during the day, and his son lived with them. Plaintiff talked to the son, when he was awake, and she spent about an hour or two

on the phone with Mr. Rhymer. Plaintiff opined that she worked less than an hour on her chores during the day. (Tr. 367-72)

Upon examination by Plaintiff's attorney, she stated that she refused to spend time alone with her 3-year-old grandson. She also thought about harming herself on a weekly basis because she did not like living the way she did. (Tr. 372-73)

Mr. Rhymer also testified regarding Plaintiff's seizure in January, during which time he had to pull over the car and care for her. He believed that Plaintiff had about 2 grand seizures per month. The small seizures entailed staring into space or wetting the bed. These seizures occurred 3 times every 2 weeks and could last up to 4 minutes. Mr. Rhymer left list of chores for Plaintiff, which included light dusting of the bedroom and bathroom, along with washing one load of clothes. She also took care of the dogs. Plaintiff lost track of the days and would forget instructions. She also had problems with anger and concentration. Mr. Rhymer did not believe that Plaintiff could remember things in work setting. She had recently filled the house with smoke when she forgot she was making popcorn and burnt the oil. (Tr. 373-82)

On the weekends, Mr. Rhymer and Plaintiff would watch a movie together. She liked to go places, so he would take her shopping. On a good weekday, she washed a couple of loads of clothes and put them away. She also washed dishes and dusted. Mr. Rhymer testified that she could accomplish all of these things twice a week. (Tr. 383-84)

Upon questioning by the ALJ, Mr. Rhymer stated that Plaintiff's physical and mental condition had worsened. With regard to medications, the Lamictal helped her, but she had to have several medications adjusted. She was wide awake during the night, moving around, which scared Mr.

Rhymer. She tended to eat at night, so Mr. Rhymer put a small refrigerator in their bedroom to prevent her from going downstairs at night. (Tr. 384-86)

The medical examiner, Dr. Reid, also questioned the Plaintiff and Mr. Rhymer. Plaintiff took the prescribed dose of Lamictal every day. Dr. Lee gave some samples, and Mr. Rhymer purchased the rest. Plaintiff never used alcohol or street drugs. Plaintiff's mother and sister had an order of protection against Plaintiff because the sister was a paranoid schizophrenic. (Tr. 386-90)

Next, the ALJ questioned Dr. Reid regarding his review of Plaintiff's medical records. Based on his review, he stated that he was unable to find any credible evidence that the Plaintiff had a mental disorder causing a significant functional deficit. Specifically, he testified that Dr. Jordan's report was "unbelievable" and that the personality testing results were either invalid, or Plaintiff had a significant drug problem. Dr. Reid did find her memory functioning tests valid, with no objective data of any memory deficits. Dr. Reid opined that Dr. Jordan simply copied computerized reports without thinking about the content. He found the results highly exaggerated or related to a drug problem and stated that Dr. Jordan should have followed-up with the results. (Tr. 391-93)

In addition, Dr. Reid noted Dr. Jordan's indication that the MMPI test was not valid because Plaintiff was either a malingerer or was sending a cry for help. Either way, Dr. Reid opined that Plaintiff was exaggerating her symptoms as a cry for help or for secondary gain. Dr. Reid noted that, although Plaintiff mentioned weekly suicidal ideation, she had not sought psychiatric treatment. Plaintiff spoke up and clarified that she saw a psychiatrist every month. Dr. Reid then recommended that the ALJ send the case back for an MMPI-II test to determine whether her personality assessment results are credible. The ALJ then asked Dr. Reid to keep the case open for 60 days in order to examine updated reports. (Tr. 393-96)

The ALJ then questioned VE Magrowsky, who again testified that, if the ALJ found Plaintiff credible with regard to the degree and frequency of the seizures, Plaintiff would be unable to work. If the VE found that the seizures were well-controlled, that Plaintiff needed to avoid a hazardous work setting, that Plaintiff could not engage in heavy work, and that Plaintiff possessed the mental limitations proffered in Dr. Jordan's report, Plaintiff would be unable to engage in her past relevant work. However, she would be able to perform some cleaning work and laundry work at the medium level. She could also perform light cleaning work, housekeeping, and office help. However, VE Magrowsky testified that one seizure at work could result in Plaintiff's termination. (Tr. 397-401)

The ALJ proffered a third hypothetical, asking the VE to assume that the Plaintiff was limited to no more than medium work in a nonhazardous work setting and was limited by severe depression, anxiety, or a personality disorder. The Plaintiff was limited in her ability to perform routine, repetitive, unskilled work and could not interact with others. The VE testified that Plaintiff could still perform the jobs earlier mentioned. Further, he stated that these jobs were low-stress in nature. However, if the Plaintiff found showing up to work every day and completing all tasks as assigned too stressful, she may be precluded form engaging in sustained work activity. (Tr. 402-403)

Plaintiff's attorney also questioned the VE. If the VE considered that Plaintiff had minor seizures occurring 2 to 3 times every 2 weeks lasting 1 to 3 minutes, the seizures could erode the occupational base. (Tr. 404-405)

Plaintiff completed a Function Report - Adult on February 28, 2005. She reported that, during a typical day, she made her bed; showered; did light housework; did the laundry; fed the cats; made a light lunch; took a nap; watched TV; prepared light meal when able; and went to bed. She

could also grocery shop once a week. She reported a loss of concentration and memory. (Tr. 132-39)

During a March 11, 2005 phone interview with a disability determinations worker, Plaintiff reported seizures in October 2004 and December 2004. In addition, her mild sleep disorder did nto result in any functional loss. Plaintiff attributed her memory problem to her medication. However, she stated that this problem was not severe and did not prevent her from working. (Tr. 102)

### III.  Medical Evidence

Although Plaintiff has a seizure disorder, Plaintiff's brief focuses on the medical evidence pertaining to her alleged mental impairment. Therefore, the undersigned will set forth those records which are pertinent to Plaintiff's claim.

After a car accident on December 22, 2003, Aamir J. Siddiqi, M.D., diagnosed a seizure disorder and told Plaintiff to avoid drinking, driving, swimming, and heights. (Tr. 278) Dr. Siddiqi prescribed Lamictal, an anti-convulsive medication. Follow-up examinations revealed headaches, insomnia, and seizure disorder, which improved with medication. (Tr. 227-38)

Plaintiff first saw David Y.S. Lee, M.D., on April 13, 2005 for complaints of seizures and headaches. Dr. Lee assessed partial epilepsy; sensory neuropathy involving the lower limbs, possibly secondary to a vitamin B12 deficiency; history of migraine without aura; and history of mild obstructive sleep apnea. (Tr. 140-42) Dr. Lee completed a Residual Functional Capacity Questionnaire on May 7, 2005, in which he indicated that Plaintiff's diagnosis was partial epilepsy. Her last 3 seizures were Summer of 2004, October of 2004, and December of 2004. After a seizure, Plaintiff was disoriented the rest of the day. Dr. Lee opined that Plaintiff's seizures would likely disrupt the work of co-workers and would require more supervision at work. In addition, Plaintiff needed to take one unscheduled break per day. She was capable of performing low stress jobs, with

absences twice a month. In addition, Plaintiff was unable to climb high places or use power tools. (Tr. 222-25)

Dr. Siddiqi also completed a Residual Functional Capacity Questionnaire on May 16, 2005. Dr. Siddiqi opined that Plaintiff suffered from a generalized seizure disorder. Dr. Siddiqi also noted that Plaintiff was unable to drive, use heavy machinery, or work on heights. Her seizures would likely disrupt her co-workers and required more supervision. Associate mental problems included headaches. Plaintiff could tolerate moderate work stress and did not require unscheduled breaks. The bad days produced by Plaintiff's impairments would require absences of 3 days per month. (Tr. 218-21)

Plaintiff attended an initial counseling session on January 25, 2006. She reported stress, depression, insomnia, anger problems, and forgetfulness. Plaintiff also reported suicidal thoughts and an attempted overdose, along with feeling anxious with uncontrollable crying, shaking, and dizziness. She was diagnosed with major depressive disorder, recurrent, severe; rule out panic attacks without agoraphobia; seizures, per client report; problems with family and social network – severe; and a GAF of 50. The treatment plan included outpatient counseling, a psychiatric evaluation, and walk-in and crisis services as needed. (Tr. 153-153A)

Follow-up appointments with the Community Counseling Center revealed continued complaints of depressive symptoms. She also missed several appointments during her treatment. Progress Notes dated April 26, 2006, noted that Plaintiff would meet by phone weekly due to scheduling conflicts. She reported nervousness over her social security court date, as she needed the money. On May 3, 2006, Plaintiff reported improvement after using the treadmill more often. Ony May 10, however, her mood was depressed and angry because the seizures robbed her of things she

could do once. Later that month, Plaintiff's mood continued to improve with increased activity, and she was upbeat and laughing. In June, Plaintiff was driving again. She found things to do like quilting in order to fight negative thoughts, and she reported going out more and going to the store. She was prescribed Effexor, Trazodone, and Celexa. Later in 2006, Plaintiff again reported feeling depressed, anxious, restless, and tearful. (Tr. 154-178)

On June 21, 2006, Reeta Rohatgi, M.D., evaluated Plaintiff at the request of Plaintiff's counselor at Community Counseling Center. Dr. Rohatgi diagnosed major depression, recurrent without psychotic features; anxiety disorder NOS; history of hypertension and seizure disorder; family problems and problems with social environment, moderate; and a GAF of 58. Dr. Rohatgi prescribed discontinuing Zoloft and taking Effexor; discontinuing Ambien and taking Trazodone; returning to the clinic in one month; and continuing individual therapy. (Tr. 151-52)

On August 29, 2006, Stephen Jordan, Ph.D., evaluated Plaintiff on behalf of disability determinations. The evaluation revealed no evidence of impairment of memory. Instead, Dr. Jordan attributed her cognitive functioning as effects of marked depression on concentration, cognitive processing rate, and psychomotor speed. He also assessed marked depression and could not rule out post-traumatic stress disorder or borderline personality disorder. He did not see a consistent pattern of symptom exaggeration on cognitive testing, although he opined that the dramatized presentation on the personality testing was her perception of being out of control in many areas of her life and a "cry for help." Plaintiff could remember locations and work-like procedures, as well as understand, remember, and carry out very short and simple instructions. However, Dr. Jordan opined that the combination of depression, anxiety, and seizures would markedly disrupt reliable capacity to maintain attention and concentration for an extended period. Further, the psychomotor slowing from

depression would markedly disrupt her ability to perform activities within a schedule or maintain an ordinary routine. Further her marked social anxiety and rapid onset of anger would disrupt her reliable ability to work in proximity to others without distraction. While Plaintiff could make simple work-related decisions, she had marked impairments in completing a normal workday without interruptions from psychologically-based symptoms. Dr. Jordan further opined that Plaintiff had marked impairment in dealing with the general public; moderate impairment in accepting instruction and responding appropriately to criticism from supervisors; and moderate limitations in her ability to respond appropriately to changes in the work setting. Plaintiff did not reliably perform household chores due to her lapses in concentration and seizure experiences. Dr. Jordan assessed major depression, recurrent, severe without psychotic features; post-traumatic stress disorder; rule out borderline personality disorder; seizure disorder, hypertension; history of abuse, family conflict, significant other's health problems; and a GAF of 45. (Tr. 180-86)

Dr. Jordan completed a Medical Source Statement – Mental on September 6, 2006. He found no restrictions to Plaintiff's ability to understand, remember, and carry out instructions. However, Plaintiff's ability to respond appropriately to supervision, co-workers, and work pressures was markedly affected by her impairment with regard to interacting appropriately with the public; interacting appropriately with supervisors; interacting appropriately with co-workers; and responding appropriately to work pressures in a usual work setting. Dr. Jordan based this assessment on Plaintiff's history and current testing. (Tr. 199-201).

## IV. The ALJ's Determination

In a decision dated May 19, 2007, the ALJ found that Plaintiff met the disability insured status requirements of the Act on December 22, 2003 and continued to meet them through January 31,

2008. Plaintiff had not engaged in substantial gainful activity since December 22, 2003. The ALJ further determined that Plaintiff had recurring depression, possible borderline intellectual functioning, a seizure disorder, and high blood pressure, but that she did not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found that Plaintiff's allegations of symptoms precluding medium work were not credible based on inconsistencies in the record as a whole. (Tr. 27)

The ALJ determined that Plaintiff could occasionally lift 50 pounds; frequently lift 25 pounds; and walk and/or stand a majority of the workday. She could not tolerate exposure to hazardous work settings; perform more than routine repetitive and unskilled work; interact with the general public, co-workers, and supervisors; or respond to more than moderate work pressures. Plaintiff was unable to perform her past relevant work as an assembler and date entry operator. The ALJ further found that Plaintiff was 49 years old, which was defined as a younger individual, with 12 years of formal education. She had no transferable skills. If Plaintiff's nonexertional limitations did not significantly compromise her ability to perform work at all exertional levels, the Medical-Vocational Guidelines ("grids") would indicate a finding of not disabled. However, if her capacity to work at all levels were significantly compromised, she could still work with certain vocational adjustments. The ALJ determined that Plaintiff was functionally capable of performing work which existed in the national economy such as cleaning jobs, laundry work, light cleaning jobs, and office help. Thus, the ALJ concluded that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 27-28)

### V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings

made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence

---

[1]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. <u>Marciniak</u> 49 F.3d at 1354.

## VI.  Discussion

Plaintiff argues that the ALJ erred in determining that her RFC did not prevent her from working in light of the clear, cogent evidence to the contrary.  Defendant asserts that the ALJ properly assessed Plaintiff's RFC and relied on vocational testimony to determine that Plaintiff was not disabled.

The undersigned finds that the ALJ erred in his RFC assessment and that the case should be remanded for further review.  Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence.  <u>Hutsell v. Massanari</u>, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted).  RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations.  20 C.F.R. § 416.945(a)(1).  " Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  <u>SSR 96-8p</u>, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis present).  The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'"  <u>Page v. Astrue</u>, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995)).  This evidence includes descriptions and observations of the claimant's limitations from the alleged impairment(s) and symptoms provided by the claimant and by family, neighbors, friends, or other persons.  20 C.F.R.

§ 416.945(a)(3). "An 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Sieveking v. Astrue, No. 4:07 CV 986 DDN, 2008 WL 4151674, at *9 (E.D. Mo. Sept. 2, 2008).

The Plaintiff argues that the ALJ erred in relying on the opinion of Dr. Reid, a consulting, non-examining medical expert. The undersigned agrees. In the instant case, the ALJ relied primarily on the assessment of a non-examining doctor to determine Plaintiff's capabilities in the work place, crediting Dr. Reid's opinion that Plaintiff did not have a mental impairment sufficiently severe to preclude work and that she was capable of engaging in work activity. "It is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment." Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir. 2004). But "[t]he opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir.2002). The SSA regulations recognize "because nonexamining sources have no examining or treating relationship with [the claimant], the weight [the SSA] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(d)(3).

In the instant case, Dr. Reid, the nonexamining source, testified that there was no credible evidence of a mental disorder and that the credibility of the tests was questionable. He found Dr. Jordan's report implausible and did not have the benefit of reviewing Plaintiff's psychiatric records from the Community Counseling Center. As stated above, this testimony does not constitute substantial evidence. Shontos, 328 F.3d at 427. Further, the opinion does not comport with the

opinion of Plaintiff's treating psychiatrist, Dr. Rohatgi. While Dr. Rohatgi diagnosed a GAF of 58[2] on June 21, 2006, Dr. Rohatgi also assessed Major Depression and Anxiety Disorder and prescribed Effoxor and Trazodone. (Tr. 152)  Plaintiff continued to complain of depression and anxiety, and Dr. Rohatgi increased/changed Plaintiff's medication.  More recent psychiatric evaluations show complaints of depression, crying spells, sleeping problems, poor appetite, and feelings of helplessness and hopelessness. (Tr. 154-161)  Indeed, Plaintiff's depression, crying spells, and sleep deprivation may impact her ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. The ALJ should have relied more heavily on the treatment notes from Plaintiff's treating psychiatrist. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) ("A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight.").

 Because the ALJ failed to give substantial weight to the opinion of Plaintiff's treating physicians and instead credited the opinions of medical consultants, substantial evidence does not support the ALJ's RFC finding.

Further, to the extent that Dr. Rohatgi's notes do not indicate Plaintiff's ability to function in the workplace, despite her mental limitations, the ALJ must further develop Plaintiff's Residual Functional Capacity. The ALJ has the duty to fully and fairly develop the record. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).  "If the ALJ did not believe . . . that the professional opinions available to him were sufficient to allow him to form an opinion, he should have further developed the record to determine, based on substantial evidence, the degree to which [Plaintiff's] . . . impairments limited [her] ability to engage in work-related activities." Lauer v. Apfel, 245 F.3d 700,

---

[2]  A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

704 (8th Cir. 2001) (citation omitted). Plaintiff saw Dr. Rohatgi and counselors at the Community Counseling Center on a fairly consistent basis. As her treating psychiatrist, Dr. Rohatgi is best suited to provide medical support for Plaintiff's RFC. Thus, the ALJ should re-contact Dr. Rohatgi and seek information regarding Plaintiff's ability to perform work-related activities.

Further, the undersigned is troubled by inconsistencies in the ALJ's decision. While Drs. Lee and Siddiqi noted that Plaintiff could tolerate moderate work stress, both noted that Plaintiff needed more supervision. (Tr. 218-225) However, the ALJ found that Plaintiff could perform medium work based on a hypothetical stating, in part, that she could not interact with supervisors. The undersigned also finds troubling the fact that the VE testified that Plaintiff would likely be fired if she had one seizure in the work setting. (Tr. 400-401) Yet, the evidence demonstrates that Plaintiff had 3 seizures with a loss of consciousness over a six-month period. (Tr. 222) Further, both Plaintiff and her boyfriend testified that she experienced 1 to 2 large seizures per month. (Tr. 357, 375)

In short, this case should be remanded to the ALJ for further development of the record and proper assessment of the evidence, including a restated hypothetical to the VE. On remand, the ALJ should re-contact Plaintiff's treating psychiatrist and physicians for further clarification and/or explanation of Plaintiff's limitations and their relationship to her ability to perform work-related activities. Once the ALJ properly determines Plaintiff's RFC and supports that RFC with substantial medical evidence, the ALJ should re-contact the VE and pose a hypothetical reflecting that RFC. "A proper hypothetical question presents to the vocational expert a set of limitations that mirror those of the claimant." Hutton v. Apfel, 175 F.3d 651, 656 (8th Cir. 1999). Based on the foregoing, the undersigned finds that this case should be remanded for further proceedings.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **REVERSED** and that the case be **REMANDED** for further consideration consistent with this Memorandum and Order.   A separate Judgment in accordance with this Memorandum and Order is entered this same date.


_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this __30th__ day of September, 2009.